Good morning, Your Honors. May it please the Court, we appeal to the District Court here because the District Court did exactly what this Court warned District Courts not to do, and in fact a short circuit, a plaintiff's case at a motion to dismiss stage was a plausible claims in that case, claims that were not blatantly contradicted by video evidence and video and body camera footage of the officers involved. Let me ask you this, just a step back on that proposition. Do you agree that it was appropriate to consult the video? Yes, the video intertwined. And your argument is basically the video doesn't contradict, so that based on the Dorietti case, it has to contradict at its core the allegations of the complaint. Yes, Your Honor, we have no issue with the video being considered. It's just how the video was considered. The video was intertwined with the complaint. There was no authenticity issues with the video. The issue is how the courts utilized the video to come to the conclusion that the District Court came to. In fact, in the Dorietti case, and I argue the Dorietti case, Your Honors, in the Dorietti case, the court said it has to blatantly contradict, and it gives some direction what blatantly contradict means. It means it's utterly discrediting the allegations within the complaint. And you think that the complaint here and the video are harmonious? I believe it was just like a movie strip from the complaint to the actual body camera. In fact, we went to the SBI to look at the video, and the video was eventually provided by Appellees in the motion to dismiss the case, and the complaint was written based on the video. What about gap filling? I understand your point that it has to blatantly contradict in order to do away with an allegation in the complaint. I totally get that, and it seems totally reasonable. What about gap filling? What about places where the complaint simply says nothing? This is not a critique, right? You cannot include literally everything that happens, right? But if I was deciding, and I'm not sure it matters in this case, I'm just trying to understand conceptually, what do we do about gaps? Like, you know, maybe, you know, I don't know what gaps would really fill here, but just conceptually, what do we do with gaps? Once we're looking at the video, to the extent, you know, we've got allegations, we'll follow those unless they're blatantly contradicted. But where there's a gap in the complaint, do we fill that gap with what's in the, you know, authenticated video? No, Your Honor, after the motion is dismissed, there is all reasonable interest to be drawn in favor of the non-moving party. In opposition, in this video, and I know Your Honor's answer is hypothetical, like gaps, not necessarily this issue. But when you look at the video, particularly in this case, we're talking about how this video went directly, what happened. To the extent there's gaps in our contention, there's not even gaps there. I think we're crossing over more so of a Rule 56 state instead of most of these misstates. Can I give you an example just to help? Because I'm curious about this too, whether, you know, our court has said it has to present a set of facts that's contrary to what's alleged or blatantly contradict. But, you know, what if, and this, I'm just hypothetical, what if the complaint says nothing about what the officers said? There's nothing in the complaint about whether the suspect is disobeying the officers. Right. But say the parties agree, we can look at the video, and in the video, you can hear the officers saying, you know, get down, get down, get down, get down. And you can see the person not getting down. Right. Or something like that. Put your arms up, and you see them not putting their arms up. Can we consider that? I think at a motion dismissed stage, the answer is no, because that person could be deaf and could not hear the officer. So it's issues that you have to go through discovery. It may figure out why. No, but that's not right, because we take it from the perception of the officer. Right? So, like, if it turns out the individual's deaf, that doesn't change the officer's perception. I think you take the perception of the officers if you're talking about the issue of facts. You're dealing with facts. Here we're talking about plausibility and claims, whether a claim state of relief can be granted. And you're looking at the complaint as to whether the complaint states that claim under Iqbal Twombly 2. I'm still, I'm at a loss on your position here. I asked you a question whether we could consider looking at the video, because the amended complaint was alleged to be, the reason for the amended complaint was to bring it in line with the video. Now, if the video were attached to the complaint as Exhibit A, we could look at the video, right? You could look at the video. Yeah. Now, in this case, it wasn't attached as an exhibit, but it was filed in response in order to bring it in line. So my question is, can we look at the video and take the video as part of the allegations of the complaint? You can look at the video as to whether the video blatantly contradicts the allegations. That's whether we can consider it at all. Doriati basically said you can consider a video if the core complaint depends on the video and it blatantly contradicts. My question, and in that circumstance, if it doesn't fulfill those criteria, you can't consider the video, right? That's correct. All right. I'm suggesting that in this circumstance, why can't we consider the video regardless? Because the video is, in essence, incorporated in your second amended complaint. Well, the video is not incorporated in our second amended complaint. It intertwines, and the complaint doesn't make reference necessarily to the video. I know, but you asked to file, and the court granted, to file a second amended complaint to bring it in line with the video. That's what you said in your motion. That's correct. And the court granted that. Then the court looked at the video. So I'm wondering whether Doriati even applies. In other words, why isn't this basically brought into the complaint through that process? Your Honor, the defendants, athletes, filed a motion to dismiss and added the video. We, in fact, amended our complaint in line with the video. The second amended complaint is the operative complaint. That's correct. All right. And so the question is, you asked to file the second amended complaint to address the video. Oh, I filed a second amended complaint after we looked at the video. And you gave the court the reason you wanted to file it is to bring it in line with the video, right? In line with the facts of what happened on the video. And the court grants that. So now why isn't the court now entitled to look at the video, which basically you're saying was filed in order to be in compliance with the video? Well, because the video was not filed with the second amended complaint as an exhibit attached. I understand that. The video was filed by the defendants in opposition to the court. It doesn't matter who filed it. It's before the court. But it can't be considered unless we have some kind of doctrine saying that's part of the complaint. Because the 12B-6 challenges the sufficiency of the complaint. That's all. The legal sufficiency of the complaint. So the question is, if we can look at the video in considering the complaint, then we would be considering the video as part of the allegations of the complaint. Well, even with that, I believe that you're still looking at the video. And I think Doherty would still apply. Because we're looking at the video, you still go back to the standard as to- Well, your argument is the video doesn't show blatant inconsistency. And if that's so, then we're not allowed to consider it. Well, my position is that if it doesn't show blatant contradiction or utterly discredit, then the video cannot be considered at this stage. It's not saying the video can never be considered. I understand that. We're talking about a 12B-6. That's correct. And we're trying to understand the limits of it. And the question is whether the video was properly considered in disposing of the 12B-6. And the preliminary question is, it can be considered if it is part of the core allegations as blatantly inconsistent. And you argue that's not so. It wasn't blatantly inconsistent. And therefore, the court shouldn't have considered the video. Correct. Okay. My question to you is different. My question is whether your second amended complaint actually depends on the video because of the grounds that you filed to give the court to file the second amended complaint. Well, our second amended complaint does not say it depends on the video. We use the video to draft the second amended complaint, but not say depending upon the video because there's a lot of facts and questions that are still there and the video doesn't resolve. So when you go back to the video- But the video provides a lot of detail about what you're alleging. And I must say, I've looked at the video repeatedly and I tried to stop a thing. I don't know how to do that on the video, but it's hard to see. It's at night and everything's fast moving, but I did see the video. And the district court did, and the district court relied on it. So the real question is if Doriade didn't provide inconsistency under Doriade, then we shouldn't consider the video at all. And my first question to you was that we should consider the video. Well, you stood up here this morning and that we should consider the video. And I might agree with you, but then you seem to be arguing that we shouldn't have considered it because it didn't satisfy Doriade. Well, Your Honor, I think that I said that the courts could consider to the extent that it's not blatantly contradictory allegations. But what Doriade is rooted from, Scott v. Harris, you're talking about a case in the Supreme Court particularly, and that was at a summary judgment stage where the video was at issue in play. And the court said if the video blatantly contradicts the facts that's within the record, then the courts can look at like most favor to the video opposed to the facts or the allegations made by the appellees or the appellate within that motion for summary judgment stage. It went up to the Supreme Court. So even in Scott, even in Scott, a video in play, the courts, even at a summary judgment, because the Supreme Court at a summary judgment issue said if the video does not blatantly contradict. You're missing my question. My question is where the 12 v. 6 stage, the procedure for converting it to summary judgment wasn't followed. And so, and the question is why did the district court consider the video? And the reason the district court considered the video was because the second amended complaint, the whole complaint was filed based on the video because that was the basis for your motion. We want to bring it in line with the video. And so that sort of invited the court to look at the video and said our complaint, that's what our complaint is doing. And so the court looks at the video and actually the court tried to follow Doriade and said it was blatantly inconsistent. But I'm wondering whether that has to be satisfied at all in this case at all. And you say it does. Correct. And my question then is how do we address your request? I don't know if it's your personal, but your request has filed a second amended complaint based on the video. Even in Doriade, Doriade relied on the video as well. In fact, both parties in Doriade cited to the video in their application. I asked for the lawyer in the complaint as well as in the response to the motion dismissed by the appellees in that case. So even in that case, the court said both parties relied on the video. Even though it relies on the video in the complaint or in the response to the pleadings, if the video does not blatantly contradict the allegation, regardless of the reliance of the video, it does not get over that issue. But if the video is authentic and is part of the complaint. That's correct. If it is authentic and part of the complaint, it seems to me we read your complaint and we look at the video. And we determine whether you've stated the cause of action. Well, to the extent, I think you look at the video to the extent that you rely on the video if it blatantly contradicts. Even in the Doherty case, particularly when it got to the issue of the qualifying meeting, the Doherty case said because the argument rests on an improper construction of the facts and the point in the proceedings, we declined to consider alternative argument because we was at a 12B6 standard, which is a less standard we're talking about. We were talking about possibility. Let me ask you a hypothetical then. And this is totally hypothetical. So I'm not, we're not deciding the issue. Let's assume that the video is part of the complaint. Where do you take your case then? Don't you agree that the video gives you some difficulties? No, I don't believe the video gives us difficulties. Which is because, one, when you look at the video particularly, and you talk about a Barnes versus Felix, and we're talking about totality of circumstances that came up after the Doherty case and before this case was cited by Judge Flanagan. Look at the totality of circumstances. The totality of circumstances, we're talking about 12 seconds where Mr. Selby was on the ground. And you can- I saw that. But then he got up and he started coming back at him. And no one knows where the knife was. And he's coming back at him on his all fours and he's coming pretty quickly. And they shot him again. So that, it seemed to me, we have a lot of cases where that type of threat is responded. And, of course, the officer was entirely regretful that he had to shoot. He tried to give him medical attention. He told him, keep breathing, keep breathing. He called the medics. And afterwards he's cussing at himself for having to use the gun. But the point was there were two threats. The first one is when he told him to drop the knife and instead of dropping, the man came at him with the knife in his hand. And he shot him and he went to the ground. He's on his back for a while. And then he gets around on his thing and he says, stay, stay put, stay put. He keeps coming at him. And he shot him again. So my question is, you say the officer used excessive force in that case? Yes. One, when you look at the cases cited by the District Court, Sigmund and Rampart, one, and you'll see I'm running out of time. Can you allow me to finish my response? When you look at those cases and you look at the facts in this case, one, it's disputed as to whether, well, I don't think it's disputed. I think it clearly shows that Mr. Selby did not have a knife on the 12th. However, you continue to look at the video, you can look at Deputy Gibbs' body camera. Officer Glasser, Deputy Glasser, we asked when Deputy Gibbs asked him where's the knife, he goes over and goes to. Yeah, but the guy who took the shot didn't. He kept saying, where's the knife, where's the knife? You couldn't see the knife. I tried to look at the knife when he got up from the ground. I couldn't see whether he had a knife. Well, the shooter knew where the knife was at because he went right over. He came out with a knife, clearly. He came out with a knife. And he came at him with a knife for the first shot, right? Well, I disagree that he came at him. I think he came down the stairs. He missed the stair. And he immediately, he dropped the knife and he shot him. He didn't drop the knife. Two shots, right? I mean, two incidents. First is a shooting when he came down the stairs. And he was coming at him with a knife. He shot him. The plaintiff went to the ground. Not the plaintiff. The deceased. Yeah, he went to the ground. And he's on his back and he's complaining. Of course, he had a stab wound, too, which ultimately was probably the cause of death. But he was bleeding from a stab wound and he's lying on the ground. And then he rectifies himself and starts coming up at him. And he's ordered to stop, ordered to stop, and the guy shoots him again. And it turns out that put him down. Now, what killed him, that's another issue. But there were two provocations, so to speak. And my question is, which one did you think was inappropriate? Well, it's argued that all shots was inappropriate. However, with the second and third shot, and the other coined it as that he was coming up, I think that's disputed as to whether he was coming up. And I think that you have a witness there. We're talking about that Mr. Shelby was trying to run between the officers. If you look at the video, they're at a 45-degree angle, and he's going in between. Actually, he came down the stairs. He was ordered to drop the knife. He came down. He was standing still. He was ordered to drop the knife. After several orders, he came running down the stairs with the knife at the officer. You know, we're talking about the second and third shot. I'm talking about the first shot. Well, will you ask me which ones? I said arguably all of them, but particularly the second and third shot. Clearly in an appellate's position. Well, he's coming back at him again. Well, I think that's disputed. And I think at this stage we're talking about. I saw it in the picture. He's on his hands. He's coming up, and he's trying to rectify himself, and he's coming fast at the officer. Well, I think we agree that this is disputed, but just the way he's coming towards him, I believe that the video is showing, you look at his video, that he was not coming towards him. Deputy Glasser was off to the 45-degree, and Deputy Gills was off to the right side of the 45-degree, and he was coming between. And, in fact, he didn't really even get a chance to even go get up, particularly when the shots were fired. But the issue is, particularly when you look at it in motion at this stage, those are issues that's not utterly discredited. You only can look at it one way, and somebody else can look at it another way. That's why you go through discovery. In fact, in the Doherty case, when that case got remanded, the officer in that case, he testified that he shot Mr. Crenshaw, and he was driving away. We would have never got to that in Doherty unless that case was remanded. This is the same issue here. We have a witness here on the scene. You're talking about ballistics. You're talking about experts. You're talking about pathologist experts, which we utterly disagree that the cause of death was related to a stab wound, considering the evidence that pathologists have looked at it, and we have not got a chance to present. Well, Your Honor, that's the exact reason in Doherty why we reversed these cases. If it's not blatantly contradicted, utterly disregarded, or the allegation is utterly discredited at a time why we should go through discovery. The question that Your Honor is asking, discovery should be go forth to determine as to whether the act was reasonable. At the motion to dismiss stage, that's the standard. And I would ask this court to reverse remand and reserve some of my time for rebuttal. Thank you. Yeah, you have rebuttal. We'll see you back on rebuttal. All right. Thank you, Mr. Dennis. Mr. Haynes. Ms. Haynes. Good morning. May it please the court. Sunny Haynes and my colleague Chris Geis on behalf of the defendant's appellees. The law allows the use of deadly force when a law enforcement officer Let's start in the beginning, though. Yes, Your Honor. We're at a 12B6 motion, and the district court considered the video. It wasn't made an exhibit to the complaint. It was the basis for the second amended complaint, I believe. The argument is that the video doesn't blatantly contradict the allegations of the complaint, and therefore should not have been considered. What's your response? My response is what principally the video blatantly contradicts is plaintiff appellant's idea that Mr. Selby did not continue to pose an imminent threat. The imminent threat to Deputy Glazer as well as sergeant gets persisted. That's a conclusion. That's not a factual allegation. Right? So, like, it's true. Somebody needs to decide. Was he an imminent threat? Right? But that's not a factual allegation that can be disputed. Right? That's like saying, is it reasonable? Did he face an imminent threat? Like, that's the conclusion. Right? The facts are, you know, comes down the stairs, proceeds in this direction. Those are the facts. There's a knife. Maybe the knife was put down. But those are the facts. It can't contradict the broad conclusion. It has to contradict the facts, no? The predicate facts that support the conclusion that the imminent threats persisted until after the third round was fired are the fact that Mr. Glazer moved quickly down the stairs. The complaint reads, the second imminent complaint reads as if he proceeded down the stairs with his hands above his head. The video contradicts that because the key command that Mr. Selby ignored was to drop the knife. Does the complaint say his hands were above his head? I don't remember that part. It does. It says that he proceeded down the stairs with his arms raised. But the key part there is that. No, no. But those are different, right? So I agree with you. If the complaint said he had his hands above his head, right? There's my hand. My hands are above it. Right? The video would contradict that allegation. Right? But the question of whether my arms were raised, right, like, is ambiguous, it seems like to me. Like, it's not that my arms are raised here, but my arms are also raised here. Right? They're also raised here. Right? So this is the rub I'm having. It's like, what are the specific factual allegations that you think are blatantly contradicted? Mr. Selby never dropped the gun until, excuse me, the knife, until after the first round was shot. So the second imminent complaint reads as if he was proceeding down the stairs in a calm manner, in a nonthreatening manner. But what actually happened is that he did not drop the knife before he proceeded down the stairs. He proceeded down while holding the knife, which posed an imminent threat of harm to both Sergeant Gibbs and Deputy Glazer, which is why Deputy Glazer fired the first round. So that's what's blatantly contradicted is the entire idea that he was not moving in a threatening manner towards the officers. In fact, throughout the whole very short exchange. Help me understand. I think this is hard, but I just want to make, and I'll stop after this. Where do you think the complaint alleges that he dropped the knife before he went down the stairs? It said that he was unarmed, Your Honor. Where, like, tell me what paragraph you're looking at. Let me get you some paragraphs. Right? So 11 says put down the knife. He says okay. And then it says he proceeded down the steps. Right? He got another command to drop the knife. And he did not. Well, it doesn't say that. It doesn't, but that's what the video shows is that he did not drop the knife. And so you're, but that's not a blatant, or your argument is that's the blatant, it's a contradiction by omission. It goes back to your original question to Plano's counsel, which was where are, if there are gaps, does the video fill in the gaps where the complaint is silent? It does where those facts are relevant to the analysis here under Graham v. Conner and also the qualified immunity analysis.  So I understand that argument, but that's a distinct argument. Right? That's distinct from saying there's a blatant contradiction. Right? So you may be, it may be that we can consider it to fill gaps. But what you said, it blatantly contradicted the complaint. When I look at the complaint, the complaint simply doesn't say whether when he came down the steps he had dropped the knife or not. It doesn't answer that question. And so maybe we, you know, given the fact that he's continuing to get commands to drop the knife, maybe we infer that he actually still has the knife. I mean, that's the best read of what it's saying is as he comes down the steps, if he's still getting commands to drop the knife, the natural implication is that the complaint actually agrees that he had the knife when he came down the steps. Well, what the complaint says, I'm on 96 of the joint appendix, so Deputy Gibbs, paragraph 11 here, Deputy Gibbs gave a verbal command for Mr. Selby to put the knife down to which Mr. Selby responded okay. That is correct. I could hear him say okay in the video, but the key part there is that he did not drop the knife before advancing towards the officers. That is why those are the predicate facts that show that he continued to be an imminent threat. Well, the sentence you'd have to rely on would be while Mr. Selby's arms were raised and within seconds of giving the command, you got shot. In other words, the idea is that he had thrown the knife down and he's raised his hands. That is the idea, Your Honor, and that inference is not a reasonable inference when you look at the video, and it shows that he, in fact, did not drop the knife. We really don't know where the knife went. He didn't raise his hands either in the video. I agree with you there, Your Honor, but taking the complaint's allegations as they were drafted, that is what it says. And so he proceeded quickly towards the officers. He posed an imminent threat of harm with the knife in his hand to Sergeant Gibbs as well as Deputy Glazer. And then I want to go directly to those second and third shots because the briefing from plaintiff's appellants really focuses on those that says that the court did not properly consider what facts were blatantly contradicted. And there what you can see in the video is that despite the fact that he was told to stay down and to stop, he continued flailing his arms and he was pushing backwards. Now, the complaint characterizes that as an attempt to flee, but then also says that he was attempting to run between the officers. Well, you can't run between the officers and flee away from the officers at the same time. What the video shows, regardless of what his intent was, because we don't know what his intent was, certainly Deputy Glazer and Sergeant Gibbs wouldn't have known what his intent was, we see him pushing his body back in Deputy Glazer's direction. That's not fleeing away, that's moving towards. Well, actually, he flipped his body over. He was on his back and he flipped over on the crawl, both hands and legs, and going at him. That is correct. And before he flipped over, he was pushing his body in the direction of Deputy Glazer. Then he flipped over, and when he was on the knees, you could see that his left hand is outstretched. Now, just as this court said in the Rambert versus City of Greenville case, the suspect continued to be a threat here because, now, Rambert is critical on this point. Rambert was not actually armed. We know Mr. Selby had just been previously armed. This is around midnight. It's dark outside. The only light is either coming from the officer's flashlights or the light that was at the door of the residence. So this is a dark situation. Everything's moving quickly, happening within 12 to 15 seconds. And when he flips over, he's got his left arm outstretched. We don't know whether he might be attempting to grab for Deputy Glazer's gun. We don't know whether he was attempting to go hands-on with the officer or whether he could have been moving towards Gibbs. Simultaneously, we have Sims there, who was the owner of the residence, who's also walking towards, saying, don't shoot, but still walking towards. And there's a question in the dark about whether either of these individuals could have been armed at that point. And when Rambert said that even though Rambert was not armed, there was a known weapon, and it was Johnson, the officer's gun. Here we have three known weapons, the knife that he approached the door with, but then also the two officer's guns that either Sims or Mr. Selby could have been reaching for. And so Deputy Glazer's reaction to that to protect himself as well as his fellow officer was to continue to shoot because the threat had not subsided. And what this court precedent has stated is that the use of deadly force continues to be permitted until the threat has subsided. And in this particular case, the threat was imminent until the last round was fired. And that is why the district court properly, considering the video, together with the allegations that were not contradicted by the video, correctly concluded that the defendant's motion to dismiss should have been granted on these facts. The district court was very careful about taking the plaintiff's allegations and crediting them where they were not contradicted by the video. So, for example, the court took the plaintiff's allegation that there was blood on Mr. Selby's chest, and what the court said is, okay, well. That was here for the video, too. I mean, he was wounded. Well, what's not clear is that the officers appreciated that, but the court said, we'll take a look at that. But the reason that it was really relevant there is because it actually, if Mr. Selby had just been involved in a knife fight or in an altercation, that would have heightened the potential threat to the officers. And I see I have five minutes left, so I'm going to turn it over to my colleague here to talk about. Well, I think you have your, well, let me see. Oh, is this my full five minutes? Fifteen? Yes. You had fifteen. Okay. Did you have a question, Your Honor? No, that's all right. Okay. So I'll keep going here. Your light will be red, and then you can jump down or get a ticket. Perfect. I'll look for the red. So here, where the court looked at the complaints allegations, looked at where the video contradicted them, and then also looked at Graham versus Connor, and under the circumstances said that the officer, Deputy Glazer, was permitted to use deadly force under the circumstances because the imminent threat had not subsided until the last round was fired. Then she applied the qualified immunity test, and here, arguably, there's no constitutional violation. If you look at what this court said in Rambert, where the suspect was actually unarmed throughout the entire encounter with the officer, the court here said that the officer was permitted to use deadly force because there was an imminent threat that continued. The court here said the same thing in the Brennage case, where the threat was assessed from the moment of force, and that imminent danger justifies a shooting. Can I ask you about some of the district court's descriptions or findings, maybe, from the video?  There were some things like the officer's flashlight shakes, and the court said the ground was uneven, the officer tripped, everyone was in darkness, describing these and potentially factoring that into the analysis. The complaint doesn't say anything about that, and it might be a reasonable inference. I couldn't get a really good look at the ground to tell. Obviously, the officer's camera is not looking at the ground, so those are inferences that have to be made. Was it appropriate for the court to be making inferences from the video that were not addressed by the complaint at this stage in the proceedings? The court should, of course, take all reasonable inferences in the favor to the non-moving party, the plaintiff. But what I thought when I read that and looked at the video is that you could tell from the jumping of the camera that clearly something was impeding just a clear, steady view from the camera. So that's what I thought that that inference was referring to, and then we also know that Sergeant Gibbs was backed against a utility trailer, so he did not have a clear line of retreat either because he had something behind him. What about the officer's statements after the shooting? Not in the complaint, considered by the court, potentially exculpatory, but it's the sort of thing that it seems like there might be discovery and depositions about, and what did this mean, and why did you say this, and can we credit this? And you can imagine all the arguments that would be made on one side or the other. Was the court correct to consider those and factor those into the analysis, and does your argument depend on it? Our argument does not depend on it because even if you were to take those out of consideration and say that they were not dispositive, what we have is still a short, continuous encounter in the dark of night where the imminent threat continued to persist until after the first round was fired. So the fact that it was a good shoot and the court mentioned that, I do not think in any way that was dispositive to the court's decision. What was dispositive was what the video showed paired with the contradicted allegations of the complaint, the Graham v. Cotter totality of the circumstances analysis, and then the application of the facts and the law to the qualified immunity analysis. So that is what was dispositive to the district court in granting the motion to dismiss. Just briefly on the qualified immunity analysis, the court correctly considered that either prong under Saucier v. Katz, whether you consider that there was no constitutional violation or that there was no violation of a clearly established right, it's very clear here that there was no clearly established right that was violated under the circumstances. The officer, Deputy Glazer, Sergeant Gibbs, were faced with an imminent threat, and they were privileged to use deadly force in order to protect themselves under those particular circumstances, and the court correctly determined that. So again, with the federal claims, all of the state law claims rose and fell with the merits of the federal claims, and the court properly dismissed those as well. All right. Thank you. All right. Mr. Geis. Thank you, Your Honor, and good morning, Your Honors. You may please the court. First, sitting behind me are Deputy Glazer and Sergeant Gibbs, and they are the officers who responded to the scene. They did not know what they would encounter that night, and they had seconds to react to what they did, seconds to react to what unfolded, but that is what law enforcement officers deal with every day. It is why the applicable legal standard here comes from Graham v. Conner, which is what an objectively reasonable officer would do in that situation, and these officers, unlike us, do not have the luxury of what the case law has called armchair reflection. Can you give me an understanding of all of that? Can you help me understand what your view of the video is and what we can do with it? So much of the discussion of the Graham factor sort of feels like a summary judgment inquiry, and I totally understand that and can see how a summary judgment opinion could easily be written here, but we don't have that, right? And so we do have places where the district court sort of seems to go well beyond whatever we could think about using the video for, the sort of exculpatory statements after the shoot seems like the most obvious but not the only examples. Help me understand how you think we have a complaint that doesn't expressly reference or incorporate the video, and except for a minute, hypothetically, that it doesn't blatantly contradict the allegations either, but it does obviously provide really helpful context that sort of points out why there's probably not a constitutional problem here, but I feel like that's a Rule 56 question, not a Rule 12 question. Help me sort of unravel that, can you? Those are a lot of questions, Your Honor. It was, I know, but you get the sense, right? Yes, yes, Your Honor, and I was going to discuss the clearly established prong of this issue and all the cases where officers had even mistakenly shot somebody, but I'm going to answer your question directly with a little background on the history of this case. This complaint was filed only because the plaintiff watched the video, the plaintiff and the plaintiff's attorney. They don't know what happened except what they saw on the video. When they filed the second amended complaint, they said we wanted to track the video. So there should be no issue in this court about whether or not the video is properly before the court. It is. The plaintiff admitted that. And when they filed the complaint, actually, they said the video tracks play-by-play exactly what happened, or the complaint tracks play-by-play like a transcript in real time what happens on the video, and that's demonstrably not true. For example, when they, if you talk, if you look at what Judge Niemeyer said about Mr. Selby's hands being raised above his head, the strong implication there is that this man is surrendering, and if you shoot a man who's surrendering with his hands above his head, that is blatantly unconstitutional and unlawful. I understand, but your colleague on the other side is a better lawyer than you're giving him credit for, right? He doesn't say the hands were above the head, right? He says the hands were raised, and that's a little bit ambiguous. He does in the briefing, and it is. Well, but all I get to look at, I think, is the complaint. I totally understand the argument you're making, right? But the complaint doesn't say that. Well, Your Honor, years ago, before videos were readily available, we pieced together what happened through deposition transcripts, affidavits, medical records, photographs, and other evidence. And in numerous cases, and I can give you a list of them, the court found that the officer was entitled to qualified immunity or there was no unreasonable use of force. And someone always said in those cases, if only there was a video to show us what really happened. Well, you have that here. You have objectives. But in all those, those are Rule 56 cases, right? So none of the things that you mentioned were ever being considered at the Rule 12 stage, right? All of that discussion, I totally get you. I am sympathetic at Rule 56, right? But the very example you give highlights that all of those things are being decided at the Rule 56 stage. Your Honor, you have objective truth in front of you about what happened. A plaintiff should not be able to distort the facts based on the plaintiff's perception of reality to overcome objective truth. And that's what this case is. That's what happened in Scott v. Harris as well. Justice Scalia said, look, you can say whatever you want. You can say it's Tuesday when it's really Wednesday. We're going to look at the video and determine that it's Wednesday. And I see I'm running out of time here, Your Honor. You can finish your answer, Tim. And the court said in Scott v. Harris, we can look at what actually happened. We don't have to listen to what the plaintiff says happened. And you've got numerous factual inaccuracies, misleading assertions, and other things. And that is not entitled to deference, even at the Rule 12 v. 6 stage, especially when the complaint was drafted based only on the video. Does that answer your question, Your Honor? It does. Thank you. All right. Thank you. Thank you, Your Honors. All right. Mr. Daniels? Your Honors, I would like to point this court to JA 9-5, Joint Appendix 9-5. And particularly paragraph 9. It said, upon arriving to the residence, Mrs. Selby, who was suffering from a stab wound to the heart, was ordered by officers to exit the residence. Notably, Officer Gibbs was closer to the door and said she did not unholster his service weapon. Your Honor, the district court pointed in footnote 5, which is JA 134, and said that the fact that the plaintiff said that the officer first ordered Mrs. Selby out of the home, that was contradictory to look at the video. In fact, the complaint never said anything about first. The district court added the word first. And the district court going to say that other video citations similarly contradict allegations in the complaint. Does not point to one other contradiction within the district court's order whatsoever. All right. So what about this one? So I think I'm just mistaken because when I went back to try to find, I did a search for the word above his head. And you do allege on page, on JA 93, that Selby was initially shot by Glazer with his arms raised above his head. Like that, I mean, I've seen the video. Like that seems blatantly false. Do you think just, you know, you're, you've seen the videos more times than I have. Is there any way to interpret the video that his arms were above his head when he was shot the first time? Well, I believe that the standard as to whether, to answer your question, as to whether it utterly discredit, utterly discredit or blatantly contradicts. I think the video showed his arms was raised to the extent that it was raised well above his head. I think that's- No, no, not well above his head. I'm asking the question. Right? I mean, we've got the video. We'll put the girl still shot in. Right? It's not hard. Is there any argument that he was initially shot with his arms raised above his head? I don't believe his arms raised above his head.  So that is an example that that is, like, blatantly false based on the video. Or, to say it more directly, the video blatantly contradicts that allegation. I think an argument could be made, but I don't think that- No, no, I think you've effectively agreed that, like, the video doesn't show that to be true. Well, Your Honor, I think that the video shows that his arms was raised to the extent that it was raised above his head. They're not actually raised well above his head. I don't think they're raised at all. He's coming at him. He's running at him with something in his hand. There's no suggestion that he's raising his hands. Your suggestion, when somebody raises his hands, is a surrender motion. No, I'm not. There's no surrender motion. And you also allege that after the first shot, he was getting up and fleeing away from the officers. And you allege that, that he was shot while he was fleeing. And the fact of the video shows that he was shot when he was coming at the officer. Your Honor, we do not assert, we do not argue in our allegation that he was fleeing when he first was coming down the stairs. No, you use the word, this is, you're, there's two incidents here. First shot is when he's coming down the stairs. He had the knife in his hand. And that was, all the officers saw the knife. And he was coming at him. And he was shot. He went to the ground, fell on his back. He recovered, got on his front fours and continued coming in the same direction he was coming down the stairs at the officers. And he was shot twice more. And that's what the video shows. You allege he was shot first when he had his hands raised. You didn't say above his head. You said that in the initial introduction. He was raised above his head. And then you said he was shot the second time when he was trying to flee. He got up on fours and tried to flee the officers. And he wasn't trying to flee in the video. Well, Your Honor, I think that's an interpretation that. It's not an interpretation. It's you allege. I think it's argument that a reasonable jury can conclude differently, especially when you have a witness on the scene, Mr. Sims, who we believe is going to testify he was, in fact, trying to run away. That's the same issue that was argued in Doherty, particularly as to whether. Just looking at the, without anybody's testimony, just looking at the video, objectively, he was trying to get up and moving in the direction of the officer, the same direction he was moving when he was coming down the stairs. He fell on his back, righted himself after you said 12 seconds or whatever, 11 seconds, 12. He was getting up on his. And then he got up on his hands and knees and started sort of running or crawling fast toward the officer again. Your Honor, I respectfully disagree of the description that he was coming towards the officer. I think the video shows. The same direction. The same route. And I understand the officer was standing in one direction, but he was coming towards this direction, the officer standing in a 45 degree off to the side. He was not coming directly at the officer. And that's the same argument that was made in Doherty v. Slayton, that he was driving towards the officer. But once we got to the discovery, and I think that's why it's important. So what are you going to rely on a discovery that showed something different from the video? Well, one, we don't even have the officer's testimony. We don't have the officer's testimony as to what he believed. That's one thing. Also, you're talking about another witness. Of course, what he believed doesn't matter, does it? It doesn't matter. It's objectively what he was confronting. But I think it goes a long way as to whether what happened, what he saw, perceived as well. You have another witness. We're talking about experts' trajectory as to where the bullets, what direction the bullets came. And they clearly went in from back to front. Where the bullets came, went into his body. Those are evidentiary things that should be determined on a motion for summary judgment, not a 12 v. 6. When we're dealing with sort of the two prongs here, we have was there a constitutional violation and was it clearly established, it would seem to me that we can all agree the decedent moved in the general direction of the officers before the second and third shot. Does it even matter whether he lunged directly at them, lunged toward them, lunged 45-degree angle near them, when we're talking about these sorts of split-second decisions? Do you think it sounds like maybe you do, but do you think it's going to make a constitutional difference whether he was coming, you know, directly at or at a 45-degree angle between the officers who were telling him stop? That's a great question, Judge Rush. And I think that the moment of threat doctrine has been reversed by the Supreme Court. Yeah, the Supreme Court has said you have to look at the entire situation, which is presumably why we're talking about the first shot because you don't dispute that one in your brief. But you have to look at the whole situation. But, you know, obviously the moment they fire the weapon is the moment at which they must have fear that the suspect is going to injure them or someone else. Well, I think when you look at the totality of the circumstance, particularly as to the 12 seconds that Mr. Shelby's on the ground showing his hands, and the fact that you continue to look at the video, if the courts looked at the video, particularly when Mr. Deputy Glasser asked where's the knife, Deputy Glasser goes right to it. The inference that he knew exactly that the knife was by the stairs. Sorry, to come back to my question. Your argument is there is a constitutional difference, even a clearly established constitutional difference, that's going to make or break this case based on whether he was coming directly or at a 45-degree angle toward the officers. I mean, the video shows him coming toward, and your argument is just like not directly in his face. I think if we, yes, Your Honor, I think if we look at this case, particularly in the lens of Tennessee v. Gardner, where you can shoot a fleeing suspect, and we have a witness there that we haven't even reached at this point, Mr. Sims, in this matter, as to give direction to the district court as to what direction, what Mr. Shelby was doing at that time, regardless of the officer's position, what he thought, we have another witness there that said Mr. Shelby was trying to get up, he was trying to get away. So that's something that the court should consider at a Rule 56 summary judgment. But we're talking about a motion to dismiss state, and the same issues that's presented before this court was presented in Doherty as whether the plaintiffs relied on the video. But the courts in Doherty clearly said that even if the courts can't consider the video to the extent that it blatantly contradicts the other discredited allegations in this case. Did you attach some photographs to some of your papers before the second amended complaint? On your first memorandum, all the documents are not here in the JA, and I would like to look at them. But in your defense of the first complaint, did you attach some pictures? Your Honor, I don't believe that we attached pictures. I don't necessarily remember what pictures were attached. But I don't think pictures were attached. The court said something in a footnote about some pictures being attached, three pictures. I think, I don't recall if we actually attached pictures. Can you point me to what footnote you're referring to? That was when the court granted the motion to amend. They were referring to, well, I don't have that here, but I'll take a look at it. To the extent of the complaint, I think Judge Richardson's point, the complaint does not rely on the video. The point is we looked at the video and drafted the complaint as we looked at it, but it doesn't have reliance on the video because we believe obviously it's more as needed, particularly not just the video alone. I get back to this thing. This is an A and B argument. Before you get to B, before we talk about Graham-Conner, we talked about a reasonable constitution wasn't clearly established. The Daugherty Court has already said you cannot get to that if there's no blatant contradiction. You cannot get to that if there's no utterly discredit. And that court, even when the argument is made, said you can't reach that. And the fact that Your Honor believed that the plaintiff's complaint relied on it, that's the same argument that the Daugherty Court, if you relied upon it, can it be considered? And the court said no to the extent, if it does not blatantly contradict, can we ask this court to reverse and remand not only the qualified immunity issue as well as the public immunity, as this court didn't really address that issue. Thank you. Thank you. All right, we'll come down and greet counsel and proceed on the last case.
judges: Paul V. Niemeyer, Julius N. Richardson, Allison J. Rushing